everyone gets settled. Okay, Miss Coon. Good morning. You may please the court. My name is Samantha Coon and I represent Mr Robinson in this appeal. With the court's permission, I'd like to start with the evidentiary defects that require reversal of the obstruction count that was charged in account to this case stemmed from an allegation by Mr Robinson's girlfriend that he shot at her car as she returned home one evening, causing her to flee to a gas station. And the government not only charged him with possessing a firearm on that night, but they also charged him with attempting to obstruct justice and impede an official proceeding by getting her to provide false information about the shooting during jail calls after his arrest. Now the charged obstruction statute, as we discussed in the briefing, requires a very strict and a very specific mens rea requirement for criminal liability. And the government didn't identify any conduct by Mr Robinson on those calls that would satisfy that strict mens rea requirement. The government had to prove beyond a reasonable doubt that he committed some act corruptly, that is dishonestly, and that he did so with the specific intent to impede or obstruct a particular official proceeding that he foresaw occurring. So there had to be a dishonest, knowing dishonest act and criminal intent to obstruct a particular official proceeding. This is insufficiency without first addressing the hearsay evidentiary objections, right? Because we assess sufficiency free of those. Correct. Based on the record as it exists. And so the two, the government basically made two allegations about what constituted obstruction in this case. The first one was a set of calls from immediately after his arrest, where he's asking his girlfriend to go to Orleans-Paris District Attorney's Office, who first charged this case, and to submit an affidavit, sign an affidavit with them. And he expresses that he thinks that'll get the charges dropped, he'll be able to bond out of jail. But the government didn't provide any evidence through the trial that anything from that affidavit would have been dishonest, that the girlfriend would have had to lie in the affidavit. They didn't ask any questions or provide any evidence of the content of that affidavit. Now, you know, I mean, I think that's an important issue, whether they've got a 1512 case that rests on just, hey, drop the charges, with no apparent lie suggested by the defendant. But this count too was charged March till October. So it sweeps in the March and the September calls. Wouldn't you have to have said, that's duplicitous, break it up into two counts, and then you could challenge the March calls. But as they charged it, and as it wasn't objected to, no unanimity requirement request, you're going to have to show that the September calls, disagree with me, you're going to have to show the September calls also don't amount to obstruction, right? Correct. Under this, yes, on this record, there was no challenge or effort to get those. But in the September calls, it's a lot more exasperated, and he's telling her, you got to get back in there, you've got to exculpate me. So I would disagree with that, Your Honor. I think if you look at the September calls, so setting aside the affidavit issue from March, we have a call, it's broken up into two, but the call disconnects and then they reestablish it. It's in September, so it's six months later, he's in Jefferson Parish custody, which is not the parish, not Orleans Parish, where the charges were initially brought that ultimately culminated in this case. And so while he's in Jefferson Parish custody, they have a phone call, and at the very beginning, she indicates that she has already met with Jefferson Parish District Attorney's Office, she's already had a conversation with them, she's not planning to engage with them anymore, and he begins asking her what happened at that meeting. And so if you read the calls, he's asking her questions about what they asked about, what happened at the meeting, that's when she tells him, oh, they asked about Orleans Parish. And if you read the calls, he expresses surprise that they're even asking about Orleans Parish, and then is asking her, well, what did you say, what did they ask you about, why were they asking about Orleans Parish? And so all of that conversation is about what happened at a prior meeting with Jefferson Parish. And so for two reasons, that doesn't satisfy the obstruction statute. The first one is that there's no substantial step toward obstruction, there's no obstructive act, because he's not directing her to do anything in the future. In all of the cases that address violations of these statutes of 1512, there is some directive, go lie to that FBI agent. This is the retrospective argument, but am I right, or I think it is right, didn't he say, if they were to bring Orleans Parish up in anything, all you have to do is say, I'm not talking about what's going on there. I don't know what happened there. I think you have to read that in the context, Your Honor, because if you're reading it in the context, and granted, the dialect flips back and forth between present and past tense verbs But if there's even an option for forward looking, the jury could draw that inference. I think if the jury could reasonably infer that he is actually directing her to do something in the future, that would be different for that retrospective aspect of the argument. But I don't think that's what the calls show. I think the calls have to be viewed in the context of the conversation. And so in viewing it in the context of the conversation, she's repeatedly expressed to him, she doesn't have any plans to talk to anybody going forward about anything, and she's frustrated that it even came up in this conversation. And she's explaining why, well, yeah, I told them the same thing. I can't change my story now. And he's telling her, well, this is what you could say, this is what you could have done. And so I don't think that rises to the level of an obstructive act. There's no directive. Every other case that we've seen with these violations, it comes down to an actual false affidavit, you know, take responsibility for something that you didn't do. Or it's something directing people, oh, when you go, you should testify according to this, or you should tell the FBI this. Is it relevant that she actually then does, instead of saying I don't want to get involved, she actually does come in and exculpate him? No, because the inquiry here is about his intent and what he's telling her in that moment. The fact that a year and, I think it's a year and two months later that the trial happens, and she comes in and she says, I was mistaken. Even if the jury believes that that is not true, that she's lying on the stand there, that is not evidence of what his intent was at the time, and it's not evidence that he was engaging in an obstructive act on those September 2020 calls. And then even if we take that aside, and even if the jury could conclude, even if he had said, well, go back to Jefferson Parish, go back to them and tell them you made it up. Even if that had happened and there was some evidence of an obstructive act, the fact that this was not, there's no evidence that he contemplated a particular official proceeding stemming from that. And there has to be specific evidence that he intended his conduct to directly, specifically affect an official proceeding. And as we talked about in the briefing, this is, it's clear from the record for the jury, they see he is in custody in a different parish, not where the shooting occurred. It's clear for them conversations that they're discussing some alternative, different investigation that is not related to this shooting. In fact, that's why Mr. Robinson expressed a surprise, they're even asking her about Orleans Parish. And so with all of that context, there's no way for a jury to conclude from this, that he was telling her these things and saying these things while he was contemplating and intending to affect an official proceeding. There is no official proceeding. The government never identified an official proceeding that that was directed to. Nothing in the record shows anything stemmed from the Jefferson Parish investigation. And again, Orleans Parish was the prosecuting agency prior to this case being brought. And so for both of those independent reasons, those September calls could not prove the obstruction count beyond a reasonable doubt. And if the court doesn't have any further questions about that issue, I'll move on to some of the evidentiary aspects. Turning to the shooting itself, the government's case against Mr. Robinson was based solely on his girlfriend's initial allegation that he was the one she saw come out and shoot at her car when she got home that evening. There was no corroboration. There was no surveillance footage. There was no gun recovered. There was no physical evidence whatsoever. And this court has never affirmed a conviction based solely on a single witness's recanted allegation against the defendant. There's never been evidence that thin that has supported on appeal a conviction. Even if the court disagrees at the end of the day, though, and we've explained why we believe that is not sufficient on its own, particularly in light of her recanting under oath and the additional evidence and testimony regarding the implausibility of her full account. She said that the person who shot at her somehow appeared a mile away, and it was also her boyfriend a mile away seconds or minutes later. Aside from all the reasons that that should not rise to the level of sufficient evidence for conviction, even if this court disagrees, there was improper hearsay and also improper prosecutorial remarks that were all directed to the central issue, which was the credibility and the reliability of her initial account. And so because of that, those improper remarks and that improper hearsay necessarily cannot be found to be harmless and affected this trial. So focusing on the improper hearsay, and I know that there's some stuff that has to be parsed apart, we have not challenged the 9-1-1 call. We acknowledge that that would fall under the exceptions for excited utterance. But all of the body camera footage, except for her specific statement... Okay, go ahead. 9-1-1 call. The 9-1-1 call. Excited utterance. And you're not challenging the prior IDs? Correct, and specific... Or present sense impression, right? When she's sort of screaming at him because she sees the bullet, says, you're trying to kill me or whatever. That... Remember the screaming moment? She's seeing the bullets in the car, and she realized her child, and the testimony was they were screaming at each other. That would be an excited utterance. I would not agree with that, Your Honor, because first of all, if we're talking about her phone call with Mr. Robinson, that didn't happen at the moment that she saw the bullets. The moment she saw the bullets is captured on a body camera, when they're looking at the car, and she goes... And she notices there are bullets that she didn't see before. Okay, are there three sets of calls? There's the jail calls? Yes. There's the body cam? Correct. And then there's the 9-1-1? Correct. And which of those are you saying contains hearsay that was prejudicial? Both the body camera and the jail calls. Okay. All right, but the jail calls, that's mostly admissible party opponent. Primarily, but I would say in the jail calls, I think the most damning and prejudicial information... I'm sorry? Comes from her in response. Comes from her talking about Jefferson Parish, in particular, saying they know more than I do. You asked for a limiting instruction as to her contextual responses, or you didn't? I believe counsel below challenged the admission of it. I don't know that counsel alternatively asked for an instruction. Because I think there are some difficulties here. We'll see what the government says, evidentiary ones. But therefore, preservation becomes important. Because clearly, his party opponent, J.L. Sellport's statements come in. And the responses come in for context. But therefore, you've got to ask for a limiting instruction, I think. I don't believe that everything that she said was necessary to provide context. For example, when she starts to... You'd have to parse. You would have to start objecting. And likewise, the body cam, I know you weren't counsel below. Mr. Ludwig was, is that correct? He never makes statement-by-statement objections. He makes an in globo. But the court made clear that it believed pretty much everything in the body camera and the jail calls was admissible as substantive evidence. So his initial... I believe he filed pretrial motions seeking to exclude it, and then... He did file pretrial motions. But that was to redact and exclude statement-by-statements, the murder evidence, and the drugs. So they very carefully, pretrial, go through, no reference to the murder, no reference to the drugs. But then I don't see any defense counsel saying, okay, this is a prior ID that comes in, but I object to this. He specifically, when they sought to admit the body camera as substantive, the footage as an exhibit, he specifically objected and said, I think most of this is hearsay. And it should not... What's the case that that preserves? It's 21 minutes. A lot of stuff is an exception to hearsay. A lot of stuff is non-hearsay. But you may well be right. Other stuff seemed to have come in for the truth. What is the best case that you can just at the beginning say, there's hearsay here, judge. You've gone line by line pretrial, but now you think that you can... I just don't see the case that says that that would be reversible error unless you object during trial to testimony about each statement. Well, I don't believe he needs to object to each statement. What's the case? What's the case that says that? I don't have a case offhand, Your Honor, to provide. But I would say under the rule, I mean, the rule for preservation is putting the court on notice of the issue or... And did Judge Fallon have to go? Did Judge Fallon have to just himself go through it? 21 minutes? No, the objection was to having it come in at all. So the problem, I think the problem here where it arose was when Judge Fallon initially admitted it, he admitted it for refreshing recollection and impeachment. And when he did that, the lawyer properly said for refreshing recollection, it shouldn't be published to the jury. It should be viewed by... And at the end, he changes... And then at the end, he said, well, I think it's substantive evidence. It's all admissible as hearsay exceptions. And prior to it being admitted as evidence, that's when Mr. Ludwig said, I think most of the body camera footage is inadmissible as hearsay. I don't think it falls under those exceptions. And so he objected to that and Judge Fallon acknowledged the ruling. And so I think that is more than sufficient to preserve, especially given that the court's own justification shifted from when he actually had it published to the jury and to the end. And so just, I guess, briefly, like I said, I think that the most damning, glaring issues with the hearsay are the discussions about what the conversations in the JP meeting were. I think also in her body camera footage where she's describing, you know, she's obviously reflecting and she's saying, well, I think he set me up because he told me that to meet him there, things like that, that were clearly inadmissible, clearly reflected her reflection of it. It's not spontaneous reactions. And then separately for the prosecutorial improper remarks, I think the most damning evidence, again, is that they, especially in opening statements, five times referred to this case as being about protecting the most vulnerable from the most dangerous. Five times mentioned the girlfriend's son, who was present and could have been killed. There was no objection. Correct, correct. And so I think that's probably the most glaring. And also in closing, when the government said that the affidavit was a false affidavit that would have been a lie, which was never introduced at all in any kind of evidence in the trial. Thank you. All right. Thank you, Ms. Kuhn. You've saved time for rebuttal, Mr. Boyden. Thank you, Judge Smith. May I proceed? Thank you. Good morning, Your Honors. May it please the Court. I'll start off with talking with the obstruction count, since that was the first thing that came up. And just to point out first, Judge Egginson, as you pointed out, this wasn't two separate charges. This was an overall, one overall attempt to obstruct that did have two different parts to it. And that's how it was charged in the indictment at page 14. Is that duplicitous? I mean, normally I think of obstruction of justice 1512 like perjury, and the unit of prosecution is each called. They aren't objecting to that, right? Correct. That wasn't raised, and that wasn't objected to. I don't think it would be in this situation, though, because we're looking at overall conduct. And we're not looking at just one of these two things being in itself an obstructive act, although possibly they could be. It's the overall conduct. It's the overall conduct from March through September, and specifically, I'm sorry, March through October in the indictment, as evidenced by the two sets of phone calls that did occur in different times. The government isn't saying, and do you have a case that would stand for when someone says, go down with an affidavit saying you don't want to pursue this? How would that be someone lying? If he's not saying, but disagree if the facts don't support it, he's not saying lie to them. He's just saying, you don't want to be involved. Tell them that. That may be true. Do you have a 1512 case that that alone? First answer to your question, I do not have a case that says specifically a request to drop charges and no other evidence would be sufficient. I don't have a case to say that. But that's not what we're saying either, to be clear. So the second part of that is, what is the purpose of the affidavit? And counsel was going to a great extent of saying he was never asked to falsify charges. It was just a drop charges. But I don't think that means the jury can infer what he actually was intending to do. And that was, you do need to say something, especially in light of the phone call in September 2020. Well, the most incriminating future looking September call. Where is it that he comes closest to saying, go down and lie? Well, it would be the two calls are government exhibit 18 and 19. And the transcripts would be 776 to 783 of the record for government exhibit 18 and 784. Forgot the closing page, but starting at page 784 for government exhibit 19. And I believe it's in 18 is the one where he says, all you have to do is this. Now, I think if we say all you had to do with this, but it's a long. It's a long diatribe. And we quoted in the brief of saying, go down there and say, look, we were arguing. I thought it was him. I was wrong. And ultimately, that's what she does at trial. And so let's take and you think you think at least circumstantially, it's clear he's talking about the Orleans Parish shooting, not the Jefferson investigation into murder. Yes, for several reasons, your honor. And that's first of all, because the conversation is about Orleans Parish several times in government exhibit 18 and 19. It's you ain't telling them people I had nothing to do with it. You ain't telling the people I had nothing to do with Orleans Parish. I know you ain't tell nothing about Orleans Parish. The conversation is about that. Her response to him is they know everything. They have my statements. They're listening to the calls. Well, she had made statements about the Orleans Parish shooting, which is the subject of the federal crime here. So the. Well, the last segment, though, she said, even if not retrospective, even if about Orleans still, where's the official proceeding? The official proceeding is a federal proceeding in both in both sets of calls in March and September. He references this in first in the March jail phone calls, which are governments 13 through 16. Several times I'm trying to get this thrown out before the feds pick it up. He's on supervised release. So it could easily be a supervised release for a federal crime. He could be picked up, revoked for that. He mentions I'm trying to get this out before the feds pick this up. They're going to know about it anyway. When I get to the office, that's government exhibit 15 764 to 771. That's a March call. But in the September call, when he's upset after the victim, Candace Anderson finally says, yeah, I told him it was you. One of the things he says is this is an ongoing investigation. What do you think my probation officer is going to think about this? So he's got a federal probation officer right then. We're seeing what his intent was. It's about a federal proceeding. It's about a concern of federal revocation, if nothing else. So I think the I think the context of that is clearly about the Orleans Parish matter, which is the subject of this case, and not the Jefferson Parish matter for which it was being investigated. Several of those, of course, the Jefferson Parish murder did not come into trial. So the jury wouldn't have heard about that. But it's not the fact that he's sitting in Jefferson Parish. It's not the place of custody it's important about. It's what they're talking about. And the conversation here, if you take a look at government exhibit 18 and 19, it's about the Orleans Parish incident. And so then taking that case, I think you can convict on the September 2020 or affirm on the September 2020 convictions alone. But I think that, Judge Higginson, differentiates the hypothetical you gave me earlier of if the only thing is a request to drop charges, is that enough? In and of itself, I don't have a case. But taking the fact in September 2020, he's saying, you have to go down and change your story. That's all you have to do. Well, what was he wanting to do with the drop charges affidavit? And the other thing, Your Honor, I think it's reasonable to infer, reasonable for the jury to infer that the request to drop charges was a request to do a false affidavit, because quite honestly, a request to drop charges doesn't benefit Sterling Robinson. He's worried about the feds picking it up. He knows his probation officer is going to know about it when they get in. A request for the state to drop charges doesn't take him off the hook for supervised release. Neither does it prevent the state of Louisiana for prosecuting without the victim's assistance or without the victim's help. They can present a case without a victim. So a request just to drop charges doesn't really get him his interest. What gets him his interest is having her make a false statement, because now you have a false statement and evidence that might make it more difficult to succeed in the prosecution. I think that's a reasonable inference, if nothing else. But again, I think the September 2020 phone calls affirmed the obstruction conviction count anyway. And moving on to the next, unless there's any questions, more questions on that, I'll move on to some of the evidentiary concerns that counsel brought up. First, the argument that everything was inadmissible hearsay is incorrect. The judge has a lot of discretion here. And the judge saw an act and ultimately says everything's coming in for several purposes, be it present sense impression, excited utterance, identification, which is not being challenged, and the 9-1-1 tape, of course, is not being challenged. This is important for an abuse of discretion standard, what we have, and first dealing with present sense impression. And it's important— Before you get to that, I guess there are multiple evidentiary issues. It is an abuse of discretion standard. But as for the jail calls, highly incriminating, do you agree that the other person on the call—there's no case law we say that those answers can come in for the truth, and yet Judge Fallin didn't give that instruction. Is that correct? He did not give the instruction. And I really took that part—I may be just misreading this, Your Honor, but I really took that conversation at the bench about the objections more on the body cam. I know, but let's start with the jail calls, because those are devastating. They are—I'm sorry. They're devastating, I agree, but they're devastating because of the defendant's own statements. But just to get an answer on mine, was it error—it may have been harmless—but was it error to not instruct the jury that when the other person in a jail call, jury cannot consider that for the truth of the matter? And I guess, was it asked for? I don't think that specific was asked for. I do think he said he thought—I think opposing counsel did say he thought some of her statements were hearsay. But it's hard for me to say error, that it is error, Your Honor, because every case I remember with a defendant's statements coming in as part of a question and answer, there's never been an issue with it. That it's always come in as a reciprocal and integrated conversation, that the questioners or the other party's statements are— Someone in jail says to his girlfriend, gee, I'm really worried about this case. And she says, you mean because you shot somebody? Could—in a jail call, could that come in as a party-opponent statement? I think it would actually be what is his response to it because— It would be— Because one, it's a question, right? It's a question as opposed to a clear statement. What is his response to that? Because that ultimately becomes the admission of the party opponent. So again, we probably have to go statement by statement, and that's not in this record. Are you saying it wasn't preserved? Are you saying it's harmless? Both or it's admissible? Assuming—and I have to go back to see the exact objection, and that's the only reason I'm kind of—I don't want to give you the wrong answer. But assuming it was, I would think it was harmless. I would argue it's harmless because at the very least, his statements are answering. It's his statements are worried about in the context of the questions. And that's important because the context of the questions here are they know what we're doing. The context is I can't lie. The context are I've already had that. And his response to that is change of story. So that's the real incriminating part here. How does he react to any statements? I just don't have a case where I can— It's just very important because jail calls come up in so many of these cases. Government uses them. It's their best evidence. But the other person, I've always thought the jury had to be scrupulously told. But the same sort of related problems with the body cam, right? And here, Mike, are the following questions correct? That Judge Fallon originally offered it to refresh and then impeach her because she's recanting. And then at the end, suddenly, government, you can go at it full bore. Sure, yeah. And initially, the prosecutor, when Ms. Anderson was on the stand and didn't remember what the case said, recollection, refreshed memory, and at that point, impeachment. It came in— What changed? What changed is I think the judge sees the whole picture at the time. And so at the very end, when they— Yes, but I'm going to interrupt. We don't admit evidence, whole picture evidence, right? And let me give you a specific example. There may be prior ID. There may be excited utterance, present sense impression for all at the scene. But then three hours later, they go to reenact it. What exception to the hearsay rule would let her statements on the body cam come in at the reenactment three hours later? Well, and with answer to that, I'll just say that the reenactment, I think, is probably on the edge of the spectrum, on the other edge of the spectrum, separate from the other body cam. Right, I agree. So let's assume error on that. It's harmless for these—for parts of this conversation. I'll assume error and let's say it's harmless, and it's harmless for this reason. Everything she did in that act, she did not—there was nothing new. The jury learned nothing new. It was the same thing they heard in the 911 call that, hey, someone was coming up. I got to the apartment. They were around, sort of shooting at me. I got away. They were shooting at me. So—and something else that, of course, was said in the body cam, but it was also testified to on the stand. Candace Anderson admitted those facts. The only thing she recanted was that it was Sterling Robinson who did it. So what happened at the body cam when it was played, to the extent there was error, it was harmless because it brought nothing new. The jury had heard it cumulatively at most, but certainly I don't think harmless enough here. When it gets to the other present-sense impressions, I think it's important—and the other arguments in there—I think it's important to understand the timeline here, that we're talking about a very relatively short time. Opposing counsel and I may disagree on this. I think opposing counsel mentions that the body cam video happened after midnight, from midnight till about 3 a.m. I think that's a footnote for a reply brief. We disagree with that based on Government's Exhibit 6 and Government's—and actually the certification, which is at page 752 to 753 of the record. What we see here at Government Exhibit 6, when you see the text string, around 6.30, Candace Anderson texts Scooter, your bags are done, we're done. There's an I-11 call that comes in at 7.07, so sometime in between that 30-minute period is when the shooting happened. 7.50 to 7.53 of the record shows that the officer arrived at the gas station where Ms. Anderson was at 7.21. The body cam is on at that time. And so the body cam is showing—and it's when you see the numbers in the record, 1.30 to 3.42, that's the minute timeline. So the last thing we have short of the reenactment, which was about three and a half hours later, was from 51 minutes to 53 minutes. So with the officer arriving somewhere from 7.21 to 7.25, we're talking about the last thing on the body cam that the jury saw happening about 8.20, 8.25. So we're talking about a situation that was less than an hour and a half from the incident itself. When it comes to consideration of whether these are present-sense impressions, for which there's no per se rule of when a present-sense impression period ends, I think the judge is within his discretion to consider that as a present-sense impression. When does she say, you trying to kill me? Was that on the body cam or is that a text? That was a text during the body cam, and I think it would line up, if you look at her, the first text, which is Government's Exhibit 6, is 8.03 to 8.04 of the record. I'm sorry, 8.03 to 8.04 p.m. It'd be at 7.52 to 7.53 of the record. That's not body cam. None of these hearsay issues come in. That's a text she sent to him. Right. His response to that, and this gets into an important thing of what the jury can consider. His response is not, of course, what are you talking about? Are you hurt? It's, man, my heart is breaking. I'm going to kill myself for real. It's a statement of remorse. And that's important, too, because for other elements, other reasons which I'll get to of what the jury can infer. But that's a situation that happened within the body cam timeline. He calls her. The defendant calls Ms. Anderson, and that's shown on the body cam. Ms. Anderson's taking pictures of the bullet holes on the body cam. There's no statement there. It's just what she's doing. And she texts that picture of the bullet holes, and that's part of that text string of you trying to kill me. When were they screaming, or were they not screaming? That would have been, by my count, approximately 8.12 to 8.14 p.m., based on the 51-minute to 53-minute portion of the body cam. So give or take five minutes there. I think it's in that range. That's when you would have had her side of the phone call where she's screaming at him. It would have been there. So you know of a case that is the government position. Can you preserve a series of evidentiary objections with an in-global or original objection? And did you argue this? We did not argue this. We assume that the evidentiary arguments were preserved by the objection of, I'm objecting to anything that's not a present-sense impression. And of course, he also understood the 911 call. He wasn't challenging that. So we assumed abuse of discretion on it. But that doesn't mean we think there was an abuse of discretion, obviously. And I think when it comes, when you're saying back, the judge sees the whole picture, the judge sees what's going on. The judge sees an adverse witness. The judge sees a witness that is recanting testimony and recognizing through the jail calls what's going on. And within the call, within the body cam, it's not just all one statement. There is excitement. As you pointed out, Judge Dickinson, when she sees the bullet holes, I think the statement is, damn, that could have gone all the way through. And of course, we know from the 911 call her son was there. And all of this leads into what the jury would believe. Ultimately, the jury was tasked with this. Did it believe beyond reasonable doubt the statements in the 911 call, which established every element necessary for the 922g conviction? Or did it believe what Ms. Anderson was saying at trial, that all of this happened, but it just wasn't him? All of the evidence here supported, supports the conviction. And opposing counsel mentioned this court has never affirmed a case on recanted testimony alone, on uncorroborated recanted testimony alone. Well, we don't have that here. We have corroboration. We have, one, the event itself is completely corroborated. She acknowledged everything happened on the stand. She never backed off of that. The one thing she backed off of that, that it was him, that it was Sterling Robinson who did it. But there's enough here to corroborate that it did. Starting with his statements, throughout the case, all the evidence presented, there's no statement of shock from him that, what are you talking about? I'm trying to kill you. There's nothing, are you hurt? It's statements of remorse. I'm about to kill myself for real. On the phone calls, when she says, you shouldn't have done that, I know, said, I'm, you know I didn't mean it. And then there's no, would you go down to the DA's office and tell him you got it wrong. It's, go to the DA's office, drop charges. There's no question about, hey, would you, would you please go tell him that you did, that I didn't do this. No, it's, go down, this is all you have to say, change your story. It's constant control and manipulation. And that's what the jury saw. And that's what came through in these cases. So the jury can infer that, yes, from his statements, he has a consciousness of guilt and he was the one that did the shooting and that the 911 call, Ms. Anderson's events on that day are more credible than what she said at trial. And what she said at trial was exactly consistent with the story that he wanted her to do. Very quickly, Your Honor. Trying to see if there's one other thing. If there are certainly any questions that you have specifically on anything that I'm missing here. But I would say the last thing we would say. We have the consecutive sentence. Yes. Thank you, Your Honor. We would, Judge Smith, we recognize the error here and what happened is Mr. Robinson was first revoked by Judge Malazzo before being sentenced by Judge Fallon for the trial. When Judge Malazzo heard the testimony, decided the revocation in which the victim also testified consistent with the trial testimony and revoked, she imposed her sentence consecutive. At that time, Judge Fallon had not yet imposed sentence. Technically, that's not correct. But what happened when we came to Judge Fallon's court, Judge Fallon initially says concurrent. The prosecutor points out there is another order from Judge Malazzo consecutive. There's concern about that having two different orders. At that point, Judge Fallon says, well, she's the one who makes it consecutive, so I'll go consecutive. That's error under this court's precedent. One judge cannot bind a future federal judge. So it appears Judge Fallon misapprehended his authority in that. So what do we do about that? Well, one, we're asking to affirm the conviction but vacate the sentence and issue a limited to impose the sentence concurrent or consecutively in this matter. It would be a limited remand for that purpose. I see my time is just about up. If there are no other questions, then, Your Honor, we would ask the court to affirm the conviction and vacate the sentence and remand as well. Thank you, Your Honors. Mr. Portman. Ms. Kuhn for rebuttal. Just briefly, Your Honors, to address the last point that you asked about for the scope of the remand that would be appropriate for if it was just sentencing, I don't agree that it should be for the judge to consider whether to go concurrent or consecutive. He made clear, he imposed his sentence. He said concurrent. He had considered all the sentencing factors and made that decision and only changed it to consecutive under the incorrect belief that that was another judge's decision. And so I don't think, you know, considering some other judge's opinion is not one of the I'm just going to defer to her anyway. So assume for purposes of discussion that we affirm the conviction. What should we do about the sentence? I think it's remand for resentencing consistent with the court's original pronouncement of a concurrent sentence. And then going back to the other issues in this case, I guess one point, you know, the drop charges affidavit would not on its own constitute obstruction. And so I think that that kind of highlights the prejudice that stemmed from part of the prosecutor misconduct. The prosecutor below in closing explicitly said he asked her to come forward and sign an affidavit, just drop the charges, sign an affidavit. She never does. She didn't for a reason because signing a false affidavit, right, would be a lie. And so the prosecutor below directed the jury that that affidavit would be false and that that alone could constitute obstruction. And so on that ground alone, I think that even if this court doesn't reverse the conviction, he would be entitled to a new trial on that. And then addressing the Orleans versus Jefferson Parish, I think there's a little bit of confusion between whether it matters what they were talking about and whether it matters of what his intent was. The government discusses how it's clear they're talking about Orleans Parish. Well, of course it is because that is the incident between them where she reported it to police and said that he had shot at her. It's clear that they're talking about what happened in Orleans. But the point of the obstruction statute is that whatever he's doing, whatever he's saying, it has to be intended to impede or obstruct a particular official proceeding. And so it's clear from the context of this, the relevance of what that information is being used for is what we're looking at here. It's clear that while they're talking about Orleans, it's being used in some kind of Jefferson Parish investigation. And he even is explaining, you know, the government mentioned that he mentions it's an ongoing investigation in that context. He's saying what happens over there, whatever whatever happens over there, it can affect what happens here. They were saying he specifically repeatedly says, I don't want the feds to pick it up. So the only time he said, I don't want the feds to pick it up was in the context of the drop charges affidavit, which again, his desire to not be prosecuted, his hope that that might, I mean, I think that contradicts the government's argument that that wouldn't have helped him. He seemed to think it would, but it doesn't matter if it's self-interested. The fact of asking somebody to sign a drop charges affidavit expressing their opinion that they would like charges not to be pursued, even if that's solely motivated by self-interested reasons, that's not dishonest. And so that can't be obstruction. It goes along the same lines of Arthur Anderson, where they talk about, you know, telling a spouse to exert marital privilege and not testify. Obviously somebody might do that for self-motivated reasons, but if that's within their legal right to do, that's not obstruction. The only other mention, yeah, the only mention of hoping that the feds don't pick it up is in that original one. And then if you look at, and it's on in the September calls that, you know, the long kind of diatribe that's block quoted in the governance briefing, he's talking about, he's saying all you had to do, or all you have to do was explaining what she could have told people. And then he says, you went over there, you went over there frustrated and mad for nothing. And so he's obviously talking about his frustrations about her prior meeting. Sorry, one second, Your Honor. I think the government's arguments itself kind of illustrate the prejudice and the inability to find harmlessness of the trial errors here. Because as the government recognizes, the only, aside from her initial identification of Mr. Robinson as the shooter, everything else relies on interpretations and inferences to be drawn from these jail calls, from their conversations, and the exchanges between the two of them. And those are ambiguous at best. And so when a case rests so heavily on a credibility determination and inferences from unclear information, the fact of, the fact that they're allowed to admit improper statements that for the truth of the matter asserted about her saying that JP has all this information about the Orleans shooting that she doesn't even know, things like that, those inevitably are going to shift the jury and could be what causes them to deliver a guilty verdict. And I see that my time has expired, so if there are no other questions. All right, thank you, Ms. Coon. Thank you.